DURYEA et al. v. LOHRKE et al.

(Supreme Court, Appellate Divison, First Department. February 4, 1910.)

Money Received (§ 9*) — Money Received from Third Person — "Subject to."

An agreement between defendants, who were creditors of an insolvent brokerage firm, and plaintiff's testator, provided that the latter would make such advances to the firm as he might desire to enable it to continue business, and that defendants would at all times "subject" their claims against the firm to the repayment by the firm of the advances. *Held*, that the agreement bound defendants to subordinate their rights to the testator's right to preferential payment in case of distribution of the assets of the firm in liquidation, but did not bind them to hold as trustees for the testator moneys voluntarily paid them out of the firm's profits after he ceased making advances, and hence defendants could not be re-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

quired to repay the same to plaintiffs, whose judgment against the firm for the advances remained unsatisfied.

[Ed. Note.—For other cases, see Money Received, Cent. Dig. § 31; Dec. Dig. § 9.*

For other definitions, see Words and Phrases, vol. 7, pp. 6712–6718; vol. 8, p. 7807.]

Scott, J., dissenting.

Appeal from Trial Term, New York County.

Action by Frances C. Duryea and others, as executors of William Duryea, deceased, against Otto E. Lohrke and others. From a judgment entered on a verdict, and an order denying a new trial, and also from an order granting an extra allowance, plaintiffs appeal. Judgment modified and affirmed, and order granting extra allowance reversed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, CLARKE, SCOTT, and DOWLING, JJ.

Robt. D. Honeyman, for appellants.

H. Aaron, for respondents.

DOWLING, J. The firm of Irwin, Green & Co. was engaged in conducting a large grain and commission brokerage business at Chicago, in the state of Illinois; its commissions for the year 1903 being nearly $120,000. In the fall of that year it became financially embarrassed for various causes, and turned for assistance to William Duryea, who was the father-in-law of one of its members. In the latter part of that year the firm owed Otto E. Lohrke & Co. about $70,000, the Bank of Montreal about $70,000, Mrs. Root about $60,000, and the customers of the firm about $70,000. With its affairs in this condition, dependent upon public confidence as a great asset in its business, and being in danger of proceedings which might end its career, the firm succeeded in enlisting the aid of Duryea, who thereupon entered into the following written agreement with defendants, composing the firm of Otto E. Lohrke & Co., which bears date March 1, 1904, but concededly was executed and delivered on March 22, 1904.

"Agreement made this first day of March, A. D. 1904, between William Duryea, of the city, county, and state of New York, and the copartnership of Otto E. Lohrke & Co., doing business in New York and Chicago.

"Whereas, C. D. Irwin and A. W. Green, copartners, doing business under the name of Irwin, Green & Co. in the city of Chicago, Cook county, Illinois, have applied to the said William Duryea for money to be used to carry on their business; and

"Whereas, the said William Duryea has agreed to advance or loan to said Irwin, Green & Co., such sum or sums of money as he may deem necessary in the ordinary conduct of the grain and commission brokerage business now conducted by said Irwin, Green & Co. in the city of Chicago, but, as a condition precedent to advancing or loaning such money or any part thereof, has requested that the firm of Otto E. Lohrke & Co. subject the payment of their claim against said Irwin, Green & Co. to the repayment to said William Duryea of any moneys by him advanced under this agreement:

"Now, therefore, it is agreed as follows:

"(1) Said William Duryea, in consideration of the payment of the sum of one dollar and the agreements hereinafter contained on the part of the firm

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of Otto E. Lohrke & Co., hereby agrees that he will from time to time, as the conditions of the business may seem to him to require, loan or advance to said Irwin, Green & Co. such sum or sums of money as in his judgment may be reasonably required in the ordinary conduct of the business of said Irwin, Green & Co., except, however, for the claims against said Irwin, Green & Co. held by the Bank of Montreal, of said city of Chicago, and said firm of Otto E. Lohrke & Co.

"(2) Said Otto E. Lohrke & Co., in consideration of the sum of one dollar in hand paid, and the agreements herein contained on the part of said William Duryea, do hereby promise and agree to and with said William Duryea that said Otto E. Lohrke & Co. will at all times subject their claims against the firm of Irwin, Green & Co. to the repayment by said Irwin, Green & Co. to said William Duryea of any and all moneys advanced or loaned by him to them after the date of this agreement, and it being understood and agreed that said William Duryea may make a similar agreement with the Bank of Montreal.                      Wm. Duryea.
"Otto E. Lohrke & Co.

"Witness as to Wm. Duryea:
     "Rob't. E. Honeyman.
"Witness as to O. E. Lohrke & Co.:
     "H. Aaron."

The agreement between Duryea and the Bank of Montreal therein referred to was duly made on or about the same date, and a further agreement was then made with Harriet E. Root, which, however, is more explicit than the one hereinbefore set forth. On the day this agreement was executed, Duryea advanced $25,000 to Irwin, Green & Co., and in April the further sum of $5,000—in all, $30,000. He never did anything further to relieve the firm from its financial distress, and it is obvious that his advances were insufficient to meet the debts due by the firm to its customers, exclusive of the three principal creditors, with whom Duryea had made this arrangement. With matters in this condition, and the firm still continuing to do business, Otto E. Lohrke & Co. demanded payment of their debt, and Irwin, Green & Co. made payments to them on account, beginning with one of $2,500 on July 21, 1904, and followed by others, which by December 31st had reached an aggregate of $25,000. The firm of Irwin, Green & Co. was dissolved in the latter part of 1905, and in the interim between the end of 1904 and the time of dissolution the business of the firm suffered, because rumors became current of its insolvent condition and confidence in it was impaired. Duryea meantime had received a payment of interest on October 26, 1904, of $761.15; but no other sum was paid him by Irwin, Green & Co. He died on April 26, 1907, leaving a last will and testament, whereof the plaintiffs are executors. They commenced an action, and obtained judgment against the members of the firm of Irwin, Green & Co., on July 27, 1907, in the sum of $34,-754.62, for the advances made by Duryea, with interest. The execution issued on said judgment has been returned unsatisfied. They have brought the present action against Otto E. Lohrke & Co. on the theory that their claim became impressed with a lien or charge or trust for Duryea's benefit to the extent that any moneys received by Lohrke & Co. were subject to the liability of Irwin, Green & Co. to Duryea for the sums advanced under the contract. They do not contend that Lohrke & Co. assumed any personal liability to Duryea for the ad--

vances made by him, but that they pledged their claim, or all they :might realize upon their claim, for Duryea's security.

Upon the submission of the case to the jury, a verdict was returned in favor of defendants; and this determination of the issue was correct, for, as we view the agreement in question, upon which plaintiffs rest their right to recover, there was no covenant upon the part of Lohrke & Co. to desist from the collection of their admittedly valid ·claim, or to postpone either to a day certain or indefinitely their right to enforce it, or to assume the payment of the debt owing to Duryea. Duryea only agreed to advance from time to time such sums as in his judgment might be reasonably required in the ordinary conduct of the business of the firm. He was not to consult with defendants upon the advances, nor take their judgment thereon, nor notify them of ·what he did thereunder. He was careful not to obligate himself to advance any definite sum, and left himself at liberty to do exactly what he afterwards did, when he ceased assisting the firm far in advance of their relief from their difficulties. With no promise on Duryea's part to do anything save to loan such amount as he might desire, what did ·defendants promise to do? Only to subject their claims against the firm to the repayment by the firm of Irwin, Green & Co. to Duryea of the moneys he might thereafter loan them; that is, to subordinate their rights to those of Duryea, so far as the latter might choose to assert them. If Lohrke & Co. had commenced suit against Irwin, Green & Co., it may well be that Duryea might have claimed a right to intervene, and have sought to restrain their enforcement of their ·claim by judgment and execution until his claim had first been satisfied; or, had Irwin, Green & Co., become insolvent, Duryea might well have asserted a preferential right to payment over defendants out of the assets of the firm. But it cannot be fairly argued that defendants in any way bound themselves to hold as trustees for Duryea any moneys which might be voluntarily paid them. To subject means to subordinate. It has been universally held that where one, for example, takes a deed of property subject to a mortgage thereon, he does not thereby assume payment of the mortgage. The only departure from this rule has been in those cases where it has been held that one who takes a deed subject to the payment of a mortgage impliedly covenants to pay the same. Stebbins v. Hall, 29 Barb. 524. But here there can be no such implication, for the explicit language of the agreement is that it is subject to the repayment by Irwin, Green & Co. So it has been held that one who takes over the assets of a firm subject to its debts did not thereby necessarily agree to assume them. King v. Isreal, 19 Misc. Rep. 160, 43 N. Y. Supp. 306. Where one who holds a second mortgage upon lands, the first mortgage upon which has become due, agrees that his mortgage shall be subject or subordinate to a new first mortgage about to be placed, he does not thereby assume payment of the new mortgage, nor waive his rights to enforce collection of his debts from the mortgagor.

It is significant that, in his agreement with Mrs. Root, Duryea especially provided that his advances should constitute a prior lien or preferred claim upon the assets of the firm, and that he reserved the

right to make such agreements as he might deem wise for his protection with the firm or its creditors; he having permission to finance or reorganize or otherwise assist the firm without prejudice by reason of Mrs. Root's claim. In the case of the agreement in question there is no language used which imports any promise on defendant's part to pay Duryea's claim, or any assumption knowingly made of Irwin, Green & Co.'s debt; there is no relinquishment of the right to receive payment from their debtor; there is no promise to postpone or waive their right to demand payment. The only natural inference from the language used is that defendants agreed that in the not unlikely event of the distribution of the assets of the firm in liquidation, voluntarily or otherwise, Duryea should first be repaid his advances; but that, if that event did not happen, they were at liberty to receive any payments voluntarily made by their debtor, and such payments did not necessarily come out of Duryea's money, nor does the evidence so establish. On the contrary, it appears that the first payment was not made to defendants until three months after Duryea had ceased making any advances. In that time, as well as the following months, when payments were made, the amount paid formed but a small proportion of what the firm's profits had been. It may be safely said that the evidence fails to show that any of Duryea's money was used to pay defendants. That this was the real agreement of the parties and their understanding of its effect is proven by the fact that while Duryea is shown to have had knowledge, both personally and through his attorney, of these payments to defendant, he never objected to them, never sought to base any claim against defendants upon them, and never demanded from defendants the moneys in suit, although he did not die until more than two years after the last payment was made. During all this time Duryea apparently did nothing to enforce payment from Irwin, Green & Co., but permitted them to continue doing business, to trade upon the credit they still retained, and to part with their assets to their other creditors so far as they would apply.

While the conclusion reached by the jury should not be disturbed, we are of opinion that this was not a proper case for the granting of an extra allowance, and the order therefore must be reversed.

The judgment should be modified, by striking out therefrom the sum of $1,500 allowed as extra costs, and, as modified, affirmed, with costs to respondents; order denying new trial affirmed; order granting extra allowance reversed, without costs.

INGRAHAM, P. J., and McLAUGHLIN and CLARKE, JJ., concur.

SCOTT, J. (dissenting). Although a large amount of evidence was received in this case, much of which was irrelevant and some inadmissible, the principal facts upon which the rights of the parties depend are few and simple. In the spring of 1904 the firm of Irwin, Green & Co., of Chicago, a grain commission house, found itself insolvent and upon the verge of absolute failure. Its principal creditors were the defendants herein, the Bank of Montreal, and a Mrs. Root of Chi-

cago, to each of whom the firm owed many thousands of dollars; these debts being only partially secured by collateral. The firm had little or no tangible assets of value, but had a large earning capacity; its earned commissions in the previous year having amounted to upwards of $100,000. In the hope of averting absolute bankruptcy, an appeal was made to plaintiff's decedent, William Duryea, who was the father-in-law of one of the members of the firm, to extend financial assistance. He agreed to do so, but required as a condition that each of the large creditors above mentioned should sign a similar agreement. That signed by the defendants reads as follows:

"Agreement made this first day of March, A. D. 1904, between William Duryea, of the city, county, and state of New York, and the copartnership of Otto E. Lohrke & Co., doing business in New York and Chicago.

"Whereas, C. D. Irwin and A. W. Green, copartners doing business under the name of Irwin, Green & Co. in the city of Chicago, Cook county, Illinois, have applied to the said William Duryea for money to be used to carry on their business; and

"Whereas, the said William Duryea has agreed to advance or loan to said Irwin, Green & Co. such sum or sums of money as he may deem necessary in the ordinary conduct of the grain and commission brokerage business now conducted by said Irwin, Green & Co. in the city of Chicago, but, as a condition precedent to advancing or loaning such money or any part thereof, has requested that the firm of Otto E. Lohrke & Co. subject the payment of their claim against said Irwin, Green & Co. to the repayment to said William Duryea of any moneys by him advanced under this agreement:

"Now, therefore, it is agreed as follows:

"(1) Said William Duryea, in consideration of the payment of the sum of one dollar and the agreements hereinafter contained on the part of the firm of Otto E. Lohrke & Co., hereby agrees that he will from time to time, as the conditions of the business may seem to him to require, loan or advance to said Irwin, Green & Co. such sum or sums of money as in his judgment may be reasonably required in the ordinary conduct of the business of said Irwin, Green & Co., except, however, for the claims against said Irwin, Green & Co. held by the Bank of Montreal, of said city of Chicago, and said firm of Otto E. Lohrke & Co.

"(2) Said Otto E. Lohrke & Co., in consideration of the sum of one dollar in hand paid, and the agreements herein contained on the part of said William Duryea, do hereby promise and agree to and with said William Duryea that said Otto E. Lohrke & Co. will at all times subject their claims against the firm of Irwin, Green & Co. to the repayment by said Irwin, Green & Co. to said William Duryea of any and all moneys advanced or loaned by him to them after the date of this agreement, and it being understood and agreed that said William Duryea may make a similar agreement with the Bank of Montreal.                                    Wm. Duryea.
                                                "Otto E. Lohrke & Co."

On the signing of these agreements William Duryea advanced to the embarrassed firm $25,000, and in the following month advanced a further sum of $5,000. The firm managed to struggle on until some time in 1905, when it ceased to do business and was dissolved. William Duryea was never repaid the amount of his advances. Very soon after Duryea had advanced the money to enable the firm to continue its business, the defendants began to press the firm for payments on account of the debt which they had agreed to "subject to the repayment" of the amounts advanced by Duryea, and so insistent did they become that between July 21 and December 31, 1904, the firm of Irwin, Green & Co. repaid to defendants on account of said indebtedness upwards of $20,000, which these plaintiffs now seek to recover. Out

·of these simple facts grew a somewhat complicated situation, owing to the fact that by signing the foregoing agreement the defendants .assumed relations between themselves and Duryea which were quite independent of and quite different from their relations with the firm ·of Irwin, Green & Co. These latter relations remained precisely what they had been before, to wit, those of debtor and creditor. Defend-·ants had not agreed to postpone the collection of their claim from the firm, or to forego any remedies which were open to them to collect it. They were therefore entirely justified, as between themselves and the firm, in insisting upon the payment of some part of their debt, .and in accepting such payments as they could induce the firm to make.

The only question is as to the nature of their obligation to Duryea, .and their right, as against him, to retain the amounts collected from the firm. The agreement is not, perhaps, as precise and definite as ·it might have been; but I think that it is possible to discern its mean-ing and effect. In the first place, we should consider the circum-·stances under which the agreement was made, for—

"Where a doubt exists as to the meaning of the words, resort may be had to the surrounding facts and circumstances to determine the meaning intended. In the construction of written contracts, it is the duty of the court, as near as may be, to place itself in the situation of the parties, and from a consid-·eration of the surrounding circumstances, the occasion, and apparent object ·of the parties, to determine the meaning and intent of the language employed." ·Gillet v. Bank of America, 160 N. Y. 549–555, 55 N. E. 292.

The surrounding facts and circumstances have already been de-tailed. The firm of Irwin, Green & Co. was insolvent and in failing ·circumstances. It owed defendants, and others, large sums of money. It had practically no tangible assets, but did have a large earn-ing capacity. The only apparent chance for defendants to realize any part of their claim against the firm was that it should be enabled to ·continue in business, so as to earn commissions. In order to continue it was necessary that some one should advance a considerable sum of ·money. If money should be so advanced, there was at least a chance that in time defendants would realize all or some part of their debt. If no money should be advanced, and the firm was compelled to stop, ·it was certain that defendants would lose their whole claim. Duryea, .and apparently only Duryea, was able and willing to make an advance ·of money; but he, not unnaturally, desired that his advances, from which it was hoped that the defendants, and other large creditors, ·might ultimately reap an advantage, should be a preferred claim upon the future resources of the firm, as against the claims of defendants and the others. It was to effect this purpose that the agreement be-tween Duryea and the defendants was made. It recited the reason for making it, and contained an agreement on Duryea's part to make such advances "as in his judgment may be reasonably required in the ·ordinary conduct of the business" of the firm. The defendants on their part agreed that they "will at all times subject their claims .against the firm of Irwin, Green & Co. to the repayment by the said Irwin, Green & Co. to said William Duryea of any or all moneys ad-·vanced or loaned by him to them after the date of this agreement." It is obvious that this was intended as a subordination agreement,

whereby Duryea should be entitled to a preference over defendants in the payment of his claim. He was entitled to the payment of his claim in full before defendants, as between them and him, became entitled to any part of their claim; but, as already remarked, there was nothing in the agreement to prevent defendants from prosecuting their claim against the firm. If the defendants had forced the firm into bankruptcy, and there had been any assets, it will not be disputed that, as between themselves, Duryea would have been entitled to be first paid, and if the money had come into defendants' hands Duryea would have had an action over against them. So if defendants had put their claim in judgment, and had found assets to sell under execution, Duryea would still have been entitled to insist upon a preference in payment. But the agreement was not made with a view to the bankruptcy of the firm and the distribution of its assets. It was made with a view to the continuance of its business, so that commissions might be earned, and it is in this light that it must be construed.

From this point of view I am unable to see why the same results do not flow from the collections of a part of defendants' claim without suit that would have followed upon an enforced collection. The defendants may not have received the very same money that Duryea advanced to the firm, but at least they received part of the assets of the firm. Their agreement was that they would at all times, not at any particular time, or for any specific period, subject their claims to the repayment of Duryea. I do not go so far as to say that they were bound to refrain from collecting anything from the firm until Duryea was paid; but it seems to me to be clear that whatever moneys they did collect remained subject to the repayment of Duryea. In accepting the payments from the firm, the defendants took a chance that, no doubt, was worth taking. If the firm had been able to repay Duryea's advances, defendants would have received a part of their debt, and to this extent gained an advantage over other creditors. But if, as it turned out, the firm was never able to repay Duryea, the defendants' claim still remained subject to the repayment of Duryea, and in so far as that claim had been collected by defendants the amount so collected still remained "subject to the repayment" of Duryea's claim.

An action for money had and received will lie whenever the defendant has received money which in good faith and equity should have been paid to the plaintiff. Such, as it seems to me, is the present case. In truth, defendants will be no worse off, if they are now obliged to repay this money, than they would have been if they had never made the agreement with Duryea; for in that case he would have advanced no money, and the firm would have failed. To require them to repay it is merely to require them to conform to the letter and spirit of their contract. That Duryea knew of the payments to defendant, if he did know of them, and made no protest, is no answer. He had no right to protest, and was not called upon to do so. As between defendants and themselves, the firm had the right to pay, and defendants had the right to receive payment. Duryea was perfectly justified in assuming that defendants would observe their contract with him, and whenever the proper time came, if it ever came, would sub-

ject their claims and the proceeds thereof to the repayment of his advances.

The court charged the jury that there was a question as to whether or not Mr. Duryea had "forgiven" this claim. I suppose that this means that he had released it. Whatever may have been meant, there was no such defense pleaded, and no evidence of the fact. There is nothing in the suggestion that Duryea did not advance enough money to save the firm. The amount to be advanced was expressly left to his judgment, and the case is not without suggestion that the ultimate failure was due to causes other than the stoppage of Duryea's advances. It seems to me that, upon the undisputed facts, the plaintiffs are entitled to recover.

The judgment should therefore be reversed, and a new trial granted.